T. GERALD CHILTON, JR., State Bar No. 002481
Jerry@chiltonlaw.com
CHILTON LAW OFFICES
110 S. Mesa Drive, Suite 1
Mesa, Arizona 85210
Telephone:     (480) 969-0500
Facsimile:      (480) 969-7056

BRENDA W. DAVIS, *pro hac vice*
bdavis@bwdlawgroup.com
LESLIE R. WAGLEY, *pro hac vice*
lwagley@bwdlawgroup.com
THE BRENDA DAVIS LAW GROUP
1990 3rd Street, Suite 400
Sacramento, CA. 95811
Telephone:   (916) 341-7400
Facsimile:    (916) 341-7410

Attorneys for Plaintiffs
COUNCIL FOR ENDANGERED SPECIES ACT RELIABILITY,
and GEORGE YARD

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| COUNCIL FOR ENDANGERED SPECIES ACT RELIABILITY, a nonprofit organization; and DR. GEORGE YARD<br><br>                    Plaintiffs,<br><br>          v.<br><br>LISA P. JACKSON, as Administrator of the United States Environmental Protection Agency; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and JARED BLUMENFELD, as Region 9 Administrator of the United States Environmental Protection Agency,<br><br>                    Defendants. | Case No.:  3:10-cv-8042-PCT-FJM<br><br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.   **INTRODUCTION**

1.      This is an action for declaratory judgment and injunctive relief which arises under and asserts violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§1531-1544.

2.      Plaintiffs COUNCIL FOR ENDANGERED SPECIES ACT RELIABILITY ("CESAR") and DR. GEORGE YARD challenge the failure of Defendants UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA"); LISA P. JACKSON, as Administrator of the EPA; and JARED BLUMENFELD, as Regional 9 Administrator of the EPA, to comply with the ESA in re-registering the pesticide rotenone for aquatic use and in approving of its applications to Arizona's rivers, streams, lakes, and stock ponds as a piscicide.   Defendants' failure to comply with the ESA is jeopardizing the continued existence of Chiricahua leopard frogs (*Rana chiricahuensis*)[1], Spikedace (*Meda fulgida*)[2], Loach minnow**s** (*Tiaroga cobitis*)[3], bonytail chubs (*Gila elegans*)[4], razorback suckers (*Xyrauchen texanus*)[5], Gila topminnows (*Poeciliopsis occidentalis*)[6], Gila chubs (*Gila intermedia*)[7], Sonora tiger salamanders (*Ambystoma tigrinum stebbinsi*)[8], Southwestern willow flycatchers (*Empidonax trailli extimus*)[9], and Jaguars (*Panthera onca*)[10] (collectively the "affected endangered and threatened species"), federally listed endangered and threatened species, and adversely modifying many of these species' critical habitat.

3.      The Defendants' actions violate the ESA by failing to pursue consultation with the FWS regarding the effects of the re-registration of rotenone on these endangered and threatened species, in violation of §7(a)(2) of the ESA. 16 U.S.C. §1536(a)(2).

---

[1]   Listed as threatened June 13, 2002, 67 Fed. Reg. 40789-40811.

[2]   Listed as threatened July 1, 1986, 51 Fed. Reg. 23769-23781.

[3]   Listed as threatened October 28, 1986, 51 Fed. Reg. 39468-39478.

[4]   Listed as endangered with critical habitat, November 2, 2005, 70 Fed. Reg. 66663-66721.

[5]   Listed as endangered October 23, 1991, 56 Fed. Reg. 54957-54967; critical habitat designated March 21, 1994, 59 Fed. Reg. 13374-13400.

[6]   Listed as endangered March 11, 1967, 32 Fed. Reg. 4001.

[7]   Listed as endangered with critical habitat, 70 Fed. Reg. 66663-66721.

[8]   Listed as endangered January 6, 1997, 62 Fed. Reg. 665-689.

[9]   Listed as endangered February 27, 1995, 60 Fed. Reg. 10693-10715; critical habitat designated, October 19, 2005, 70 Fed. Reg. 60886-61009.

[10]   Listed as endangered in United States July 22, 1997, 62 Fed. Reg. 39147-39157.

4.     These violations continue despite the availability of considerable scientific research showing that aquatic use of rotenone for piscicidal (fish-killing) purposes can adversely affect the health and survival of the affected endangered and threatened species and the habitat on which they depend.

5.     Plaintiffs seek a judgment declaring that EPA has violated the ESA by re-registering and allowing continued use of rotenone without completing consultations with the FWS and without ensuring that the pesticide re-registration will not jeopardize listed species' existence and will not destroy and/or adversely modify their designated critical habitat.   Plaintiffs seek an order (1) compelling EPA to initiate consultations with the FWS regarding the effects of rotenone, and any organic and/or synthetic formulations thereof, on the affected endangered and threatened species that may  be  affected by the aquatic use of this  pesticide; and (2) granting interim protective measures to prevent harm to listed species and their designated critical habitat until the consultation process is complete and the EPA brings the re-registration for rotenone into compliance with the ESA.

6.     Plaintiffs also seek an order declaring that the EPA has violated Section 7(d) of the ESA by making irreversible and irretrievable commitments of resources prior to the conclusion of the consultation process.

## II.     JURISDICTION AND VENUE

7.     This action is brought pursuant to section 11(g)(1) of the ESA, 16 U.S.C. §540(g)(1). This Court has jurisdiction pursuant to 16 U.S.C. §1540(g)(1), and 28 U.S.C. §1331. Further, the Court may grant declaratory and injunctive relief.  28 U.S.C. §§2201, 2202.

8.     As required by the ESA citizen suit provision, plaintiff Dr. George Yard provided 60 days' notice of intent to sue on November 17, 2009, to Defendants via certified mail and facsimile. A copy of the notice is appended as Exhibit A. To date, Defendants have not remedied the violations set forth in the 60-day notice.

9.     Venue is proper in the District Court for the District of Arizona pursuant to 28 U.S.C. §1391(e).The federal government waived sovereign immunity in this action.  16 U.S.C. §1540(g); 5 U.S.C. §702.

### III.   **PARTIES**

10.     Plaintiff CESAR is a California nonprofit, public interest organization whose mission is to bring scientific rigor to regulatory decisions undertaken pursuant to environmental statutes, to ensure consistent application of these statutes throughout all industries and all sectors, and to fulfill the educational goals of its members and provide educational information on the ESA and its application to the general public in the process.   See http://bestscience.org/.   CESAR fulfills its mission by holding educational seminars, disseminating educational materials to its members, participating in administrative proceedings, and commenting on and initiating litigation about species listings under the ESA.   CESAR brings this action on its own behalf and on behalf of its adversely affected members.

11.     Plaintiff Dr. George Yard owns ranch land, lives on and has cattle on land threatened by the re-registration, approval and subsequent use of rotenone by Defendants and has been and will be adversely affected by Defendants' failure to comply with the ESA.   This is because rotenone has already been applied to the upper Verde River upstream from Dr. Yard's ranch (in 2009), will likely be applied there again in 2010, and because at least two more Arizona streams (West Fork of Oak Creek, upstream of Sedona, Arizona, and Redrock Canyon, upstream of Patagonia, Arizona) are currently proposed for rotenone poisoning in 2010.     Unless the relief requested is granted, Dr. Yard's educational, moral, spiritual, scientific, recreational, biological, property, personal health, and aesthetic interests will continue to be adversely affected and injured by the Defendants' failure to consult with the FWS under the ESA.

12.     Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA"), is an agency of the United States charged with registering and re-registering pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§136-136y ("FIFRA") and with ensuring that the authorized pesticide uses will not cause unreasonable adverse effects on the environment. The EPA is also charged with ensuring that, through consultation with the FWS, its pesticide registrations will not jeopardize the survival and recovery of listed species or destroy or adversely modify their designated critical habitat.

13.     Defendant LISA P. JACKSON is the Administrator of the EPA and is named in her official capacity.

14.     Defendant JARED BLUMENFELD is the Region 9 Administrator of the EPA and is named in his official capacity.

## IV.     LEGAL BACKGROUND

### A.     ESA Framework

15.     When a species has been listed as threatened or endangered under the ESA, federal agencies have duties under the ESA to assess and bring their programs and activities into compliance with the ESA. These duties fall into two categories: (1) the duty to ensure that agency actions will not jeopardize the survival and recovery of listed species or adversely modify critical habitat for such species; and (2) the duty to utilize agency programs and authorities to conserve listed species. The ESA prescribes the process to be followed to ensure compliance with each set of duties.

16.     Section 7(a)(2) of the ESA requires the following: "each federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary … to be critical." 16 U.S.C. §1536(a)(2).

17.     The ESA establishes an interagency consultation process to assist federal agencies in complying with their substantive Section 7(a)(2) duty to guard against jeopardy to listed species or destruction or adverse modification of critical habitat. Under Section 7(a)(2), federal agencies must consult with the appropriate expert fish and wildlife agency to determine whether their actions will jeopardize listed species' survival or adversely modify designated critical habitat, and if so, to identify ways to modify the action to avoid that result. 50 C.F.R. §402.14.

18.     An agency must initiate consultation under Section 7 whenever it undertakes an action that "may affect" a listed species or critical habitat. 50 C.F.R. §402.14(a). Conversely, an agency is relieved of the obligation to consult on its actions only where the action will have "no effect" on listed species or designated critical habitat. Effects determinations are based on the direct, indirect,

1   and cumulative effects of the action when added to the environmental baseline and other interrelated

2   and interdependent actions. 50 C.F.R. §402.02 (definition of "effects of the action").

3   19.   Regulations implementing Section 7 broadly define the scope of agency actions

4   subject to consultation to encompass "all activities or programs of any kind authorized, funded, or

5   carried out, in whole or in part, by Federal agencies," including the promulgation of regulations and

6   the granting of licenses. 50 C.F.R. §402.02 (definition of "action").

7   20.   Agencies must consult on ongoing agency actions over which the federal agency

8   retains, or is authorized to exercise, discretionary involvement or control. See, e.g., 50 C.F.R.

9   §402.16 (re-initiation of consultation). Agencies must also consult on ongoing agency actions "if a

10   new species is listed . . . that may be affected by the identified action." *Id*.

11   21.   To initiate consultation, an agency must assess the impacts of the action on listed

12   species and their habitat and provide all relevant information about such impacts to the expert fish

13   and wildlife agency. 50 C.F.R. §402.14(c). The ESA provides for formal consultations, culminating

14   in FWS' issuance of a biological opinion. By regulation, FWS has provided that, if the action agency

15   determines that an action "may affect," but is "not likely to adversely affect" the listed species or its

16   critical habitat, the consultation may be resolved without preparation of a biological opinion if FWS

17   concurs in writing in that determination. 50 C.F.R. §402.13. If FWS does not concur, or if the action

18   agency has determined that the action is "likely to adversely affect" the listed species, the agencies

19   must conduct a formal consultation. *Id.* §§402.02, 402.14(a).

20   22.   The end product of formal consultation is a biological opinion in which FWS

21   determines whether the action will jeopardize the survival and recovery of listed species or will

22   adversely modify the species' critical habitat. 16 U.S.C. §1536(b). In order to make this

23   determination, FWS must review all relevant information and provide a detailed evaluation of the

24   action's effects, including the cumulative effects of federal and nonfederal activities in the area, on

25   the listed species. 16 U.S.C. §1536(b)(3)(A); 50 C.F.R. §402.14(g)-(h). FWS has a statutory duty to

26   use the best available scientific data in an ESA consultation. 16 U.S.C. §1536(a)(2); 50 C.F.R.

27   §402.14(g)(8). If FWS determines that the action is likely to jeopardize the species, the biological

28   opinion must specify reasonable and prudent alternatives that will avoid jeopardy. 16 U.S.C.

§1536(b); 50 C.F.R. §402.14(h)(3). FWS must also formulate discretionary conservation recommendations to reduce or minimize the action's impacts on listed species or critical habitat. 50 C.F.R. §402.14(g)(6).

23.     Section 7(d) of the ESA mandates against "irreversible and irretrievable commitment of resources" that would foreclose the agency's ability to implement reasonable and prudent alternatives. 16 U.S.C. §1536(d); 50 C.F.R. §402.09. The purpose of this section is to insure that the existing environmental status quo is maintained during the consultation process so as not to foreclose consideration and adoption of alternatives to the proposed federal agency action. *Connor v. Burford*, 848 F.2d 1441, 1445 n. 34 (9th Cir. 1988). This prohibition on irreversible and irretrievable commitment of resources applies throughout consultation and continues until the requirements of section 7 are completed.

**B.     FIFRA**

24.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") charges the EPA with registering, reviewing, amending, and re-registering chemicals and chemical formulations for use as insecticides, fungicides, and pesticides in the United States. 7 U.S.C. §§136-136y. Under FIFRA, a pesticide generally may not be sold or used in the United States unless it has an EPA registration for that particular use. 7 U.S.C. §136a(a). 27.   After approving a pesticide registration, EPA retains discretionary involvement and control over that registration. EPA must periodically review pesticide registrations with a goal of reviewing each pesticide registration every 15 years. Id. at §136a(g)(1). EPA has the authority to compel registrants to submit data necessary for a re-registration review. Id. at §136a(g)(2). Even apart from such explicit data submission requirements, registrants must submit to EPA any information about registered pesticides' unreasonable adverse effects on the environment. *Id.* at §136d(a)(2). EPA takes such information into account in reviewing and, where necessary, modifying the pesticide registrations.

25.     EPA is in a process of re-registering pesticides that have been on the market for years and often decades prior to enactment of the environmental registration requirements currently in place. 7 U.S.C. §136a(1). EPA generally eliminates or imposes restrictions on harmful uses of the

pesticides, including those uses that cause harm to threatened or endangered species, as part of the re-registration determination.

26.     The EPA Administrator has the authority to cancel pesticide registrations whenever "a pesticide or its labeling or other material required to be submitted does not comply with the provisions of this Act or, when used in accordance with widespread and commonly recognized practice, generally causes unreasonable adverse effects on the environment." 7 U.S.C. §136d(b). The Administrator may immediately suspend a pesticide registration to prevent an imminent hazard. *Id.* §36d(c).

### C.     Rotenone Use and the Affected Endangered Species

27.     The EPA classifies rotenone as highly toxic or slightly toxic depending on concentration. The World Health Organization classifies it as moderately hazardous. (IPCS, International Programme on Chemical Safety; United Nations Environment Programme; International Labour Organization; World Health Organization. (2007). The WHO Recommended Classification of Pesticides by Hazard.  WHO (www.who.int/ipcs/publications/pesticides_hazard/en/.)  Rotenone is classified by the United States Department of Agriculture National Organic Program as a nonsynthetic and was allowed to be used to grow "organic" produce until 2005 when it was removed from the list of approved substances due to concerns about its safety. (Rotenone. Resource Guide for Organic and Disease Management. Cornell University.)     Potential problems in mammals include dermatitis, allergies and possible Parkinson's like symptoms (Caboni P, Sherer T, Zhang N, Taylor G, Na H, Greenamyre J, Casida J (2004). "Rotenone, deguelin, their metabolites, and the rat model of Parkinson's disease". Chem Res Toxicol 17 (11): 1540–8. doi:10.1021/tx049867r. PMID 15540952.). Additionally, a recent scientific study published in the *Journal of Agromedicine* shows a correlation between 100 Parkinson's disease patients and the use of the pesticide rotenone (Dhillon, AS, Tarbutton, GL, Levin, JL, Plotkin, GM, Lowry, LK, Nalbone, JT and S Shepard (2008). "Pesticide/environmental exposures and Parkinson's disease in East Texas."  J Agromedicine.  2008; 13(1): 37-48.).

28.     The approved use of rotenone as an aquatic pesticide introduces many toxins into the affected endangered and threatened species' habitat.    Three ingredients in current rotenone

formulations are on the Proposition 65 list of chemicals known to the State of California to cause cancer or reproductive toxicity.  Moreover, exposure to rotenone has recently been directly linked with Parkinson's disease in humans. Further, rotenone, when used as an aquatic pesticide, interferes with oxygen use and is especially toxic to organisms that obtain oxygen from water, such as fish, amphibians and aquatic invertebrates.  Certain species of aquatic invertebrates and native fishes are particularly susceptible to long-term or permanent extirpation from streams poisoned by rotenone. (Mangum and Madrigal (1999); Maslin (1996)).

29.    Rotenone also has indirect lethal and sublethal effects as amphibians, birds and other species will likely suffer from depleted food sources because rotenone will substantially decrease insect populations and other macro-invertebrate populations and will eliminate fish populations depended on as food sources.

30.    Despite this readily available information regarding these detrimental effects of rotenone, the EPA neither initiated the requisite ESA consultation nor complied with the FIFRA prior to issuing its re-registration decision on rotenone and approving its use as an aquatic pesticide.

## V.    FIRST CLAIM FOR RELIEF

### (Violations of The Endangered Species Act [16 U.S.C. §1536(a)(2) and (d))

31.    Each and every allegation set forth above in Paragraphs 1 through 30 is hereby re-alleged and is incorporated herein by reference.

32.    Section 7(a)(2) of the ESA states the following: Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior or Commerce], insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of[critical] habitat . . ..16 U.S.C. §1536(a)(2). "Its very words affirmatively command all federal agencies to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of an endangered species." *TVA v. Hill*, 437 U.S. 153, 173(1978). The EPA and FWS must review their actions through the consultation process at the earliest possible time to determine whether any action may affect listed species or critical habitat. 50 CFR §402.14(a). Re-initiation of consultation is required and must be requested by the EPA or the FWS where

discretionary federal involvement or control over the action has been retained or is authorized by law and a new species is listed or critical habitat designated that may be affected by the identified action. 50 CFR §402.16(d).

33.     Section 7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2), requires federal agencies to ensure that their actions will not jeopardize the survival and recovery of listed species and will not adversely modify designated critical habitat. To comply with this duty, federal agencies, like EPA, must consult with the FWS and/or NMFS whenever the agency takes an action that "may affect" a listed species or the species' critical habitat. *Id.; see also* 50 C.F.R. §402.14(a). The federal agency must determine whether its actions "may affect" listed species at the earliest possible time.

34.     On its face and under ESA implementing regulations, section 7(a)(2) of the ESA applies to licenses such as EPA's registration and re-registration of pesticides. 50 C.F.R. §402.02. EPA's findings of risks of concern for threatened and endangered species equates with a "may affect" finding that triggers ESA's consultation mandates.

35.     Under the ESA, the EPA has a duty to undergo consultation to "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of an endangered or threatened species." 16 U.S.C. §1536(a)(2).

36.     In its ecological risk assessments for rotenone, EPA states that "the ecological assessment that EPA conducted for this RED does not, in itself, constitute a determination as to whether specific species or critical habitat may be harmed by the pesticide. Rather, this assessment serves as a screen to determine the need for any species specific assessment that will evaluate whether exposure may be at levels that could cause harm to specific listed species and their critical habitat." This statement is insufficient to meet the EPA's requirements under the ESA.  Over 47 threatened and endangered species live in counties where such uses are authorized to occur.  For example, Sonora Tiger salamanders, Gila Topminnows, Spikedace, Loach minnows, Chiricahua leopard frogs and Southwestern willow flycatchers live at rotenone application sites and/or sites of proposed application of rotenone and may be severely adversely affected by use of rotenone as an aquatic pesticide.

37.    EPA is in violation of section 7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2), by re-registering rotenone without completing the ESA-mandated consultations and without ensuring that the re-registered pesticide uses will not jeopardize the survival and recovery of threatened and endangered species and will not destroy and/or adversely modify their critical habitat.

38.    Separately, section 7(d) of the ESA, 16 U.S.C. §1536(d), prohibits federal agencies, after the initiation of consultation under section 7(a)(2), from making any irreversible or irretrievable commitment of resources if doing so would foreclose the implementation of reasonable and prudent alternatives. 16 U.S.C. §1536(d); 50 C.F.R. §402.09.  The status quo must be maintained during the consultation process so as not to foreclose consideration and adoption of alternatives to the proposed federal agency action. *Connor v. Burford*, 848 F.2d at 1445 n. 34. Because the registration program is an "agency action" triggering the consultation process, the EPA is subject to the prohibition on making irreversible and irretrievable commitments of resources pending final resolution of the consultation process.

39.    As EPA continues to allow uses of rotenone prior to completion of an ESA consultation, it makes irreversible and irretrievable commitments of resources that will foreclose the implementation of reasonable and prudent alternatives that may result from the consultation and, therefore, is in violation of section 7(d) of the ESA.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment providing the following relief:

1.    Declare that EPA violated sections 7(a)(2) and 7(d) of the ESA by failing to complete ESA consultations before re-registering rotenone use and for failing to ensure that the re-registered uses will avoid jeopardizing the survival and recovery of threatened and endangered species and destroying and/or adversely modifying their designated critical habitat;

2.    Order EPA to consult with the FWS pursuant to section 7(a)(2) of the ESA on the re-registered uses of rotenone that "may affect" threatened and endangered species and/or their designated critical habitat, and direct EPA to ensure that it conducts the consultations in a manner

that addresses the most significant threats posed to listed species by pesticide use in an expeditious fashion;

3.      Order EPA to make a new re-registration eligibility decision for rotenone use on an expeditious basis in which EPA re-registers a use of a pesticide only when the pesticide registrants have proved that the health, environmental, economic, and social benefits outweigh the risks; and ensures, based on completed section 7(a)(2) consultations, that the re-registered pesticide uses will avoid jeopardizing the survival and recovery of threatened and endangered species and destroying and/or adversely modifying their critical habitat;

4.      Order the EPA to prohibit uses of rotenone affecting the endangered and threatened species identified herein, and their critical habitat, until the consultation process has been completed and the EPA has brought its pesticide registration program into compliance with ESA §7(a)(2);

5.      Award Plaintiffs' costs, including reasonable attorneys' fees; and

6.      Provide such other relief as the court deems just and proper.

DATED THIS 9th day of June, 2010.

CHILTON LAW OFFICES


__/s/ T. Gerald Chilton, Jr._____
T. Gerald Chilton, Jr.


THE BRENDA DAVIS LAW GROUP


__/s/ Brenda W. Davis_____
Brenda W. Davis


Attorneys for Plaintiffs

# EXHIBIT A

# CHILTON LAW OFFICES

T. Gerald Chilton, Jr.

Jack L. Bischoff
1924-1998

110 South Mesa Drive
Suite 1
Mesa, Arizona 85210

Telephone  (480) 969-0500
Facsimile   (480) 969-7056
E-Mail:Jerry@chiltonlaw.com


### FACSIMILE COMMUNICATION

FOR THE ATTENTION OF:     Lisa Jackson, Administrator

COMPANY:                  U.S. Environmental Protection Agency

REFERENCE:                60 Day Notice of Intent to Sue Over Violation of Endangered
                          Species Act Impacting Endangered and Threatened Species in
                          Arizona Related to the Reregistration of Rotenone

DATE OF TRANSMISSION:     November 16, 2009

TOTAL NUMBER OF SHEETS TRANSMITTED (INCLUDING THIS PAGE): 7

FAX NUMBER (TRANSMIT TO):    202-501-1450

Please call (602) 969-0500 if there are any problems, comments or questions regarding this transmission.

ADDITIONAL MESSAGE:




BY:  T. Gerald Chilton, Jr.

### Caution

The information contained in this facsimile message is confidential and intended solely for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other unauthorized use of this communication is strictly prohibited.  If you have received this facsimile in error, please notify the sender immediately by telephone, or return the facsimile to the sender at the above address via the United States Postal Service.

# CHILTON LAW OFFICES

T. Gerald Chilton, Jr.

Jack L. Bischoff
1924-1998

110 South Mesa Drive
Suite 1
Mesa, Arizona 85210

Telephone  (480) 969-0500
Facsimile  (480) 969-7056
E-Mail:Jerry@chiltonlaw.com

## FACSIMILE COMMUNICATION

FOR THE ATTENTION OF:        Laura Yoshii, Acting Regional Administrator

COMPANY:        U.S. Environmental Protection Agency

REFERENCE:        60 Day Notice of Intent to Sue Over Violation of Endangered
Species Act Impacting Endangered and Threatened Species in
Arizona Related to the Reregistration of Rotenone

DATE OF TRANSMISSION:        November 16, 2009

TOTAL NUMBER OF SHEETS TRANSMITTED (INCLUDING THIS PAGE):  7

FAX NUMBER (TRANSMIT-TO):        415-947-3588

Please call (602) 969-0500 if there are any problems, comments or questions regarding this transmission.

ADDITIONAL MESSAGE:

BY:  T. Gerald Chilton, Jr.

### Caution

The information contained in this facsimile message is confidential and intended solely for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other unauthorized use of this communication is strictly prohibited.  If you have received this facsimile in error, please notify the sender immediately by telephone, or return the facsimile to the sender at the above address via the United States Postal Service.

## CHILTON LAW OFFICES

T. Gerald Chilton, Jr.
_____

Jack L. Bischoff
1924-1998

110 South Mesa Drive
Suite 1
Mesa, Arizona 85210

Telephone (480) 969-0500
Facsimile  (480) 969-7056
Email: Jerry@chiltonlaw.com

November 16, 2009

**VIA FACSIMILE and U.S. CERTIFIED MAIL**

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, D.C. 20460

Laura Yoshii, Acting Regional Administrator
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA, 94105

RE:  60 Day Notice of Intent to Sue Over Violation of Endangered Species
 Act Impacting Endangered and Threatened Species in Arizona
 Related to the Reregistration of Rotenone

This letter serves as a sixty-day notice on behalf of Dr. George Yard of his intent
to sue the U.S. Environmental Protection Agency ("EPA") and its officers and officials
over violations of Section 7 of the Endangered Species Act ("ESA") (16 U.S.C. §§1531,
_et seq._) for actions and inactions related to the registration, reregistration and continued
authorization of the pesticide known as "rotenone" pursuant to the Federal Insecticide,
Fungicide, and Rodenticide Act ("FIFRA") (7 U.S.C. §136 – 136y) which may affect
listed endangered and threatened species in Arizona. This letter is provided pursuant to
the 60-day notice requirement of the citizen suit provision of the ESA (Section 11(g) of
the ESA, 16 U.S.C. §1504(g)), should legal action be necessary to enjoin and remedy
these violations of the ESA.

The EPA is violating Section 7 of the ESA by failing to consult with the United
States Fish and Wildlife Service ("FWS") on the reregistration of a certain pesticide,
rotenone, and its active ingredients registered by the EPA under the FIFRA. In these
legally flawed effects determinations, the EPA has erroneously concluded that many
pesticide active ingredients either have "no effect" or are "not likely to adversely affect"
listed endangered and threatened species in Arizona. As a result of these erroneous effects
determinations, EPA has failed to initiate formal consultation with the FWS on the re-
registration of rotenone for use in the United States either across the board, or with
respect to certain listed species.

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
Laura Yoshii, Acting Regional Administrator
U.S. Environmental Protection Agency, Region 9
November 16, 2009
Page 2

## I.   ESA SECTION 7 CONSULTATION

As the United States Supreme Court has stated, "One would be hard pressed to find a statutory provision whose terms were any plainer than those in Section 7 of the Endangered Species Act." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173 (1978). Those terms set forth both substantive and procedural requirements with which federal agencies must comply.

Substantively, federal agencies must "insure that any action authorized, funded, or carried out ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat] of such species ...." 16 U.S.C. §1536(a)(2). Not satisfied that federal agencies possessed the requisite expertise to satisfy this substantive requirement on their own, Congress added a strict procedural requirement – that the determination of whether any federal action would be likely to cause jeopardy would be made "in consultation with and with the assistance of [the Services]." *Id.* This mandatory consultation is the key to Section 7 of the ESA; in fact, Congress titled Section 7 "Interagency Cooperation."

Section 7 embodies another safeguard to guard against substantive jeopardy. It requires that federal agencies use the best available scientific data in meeting their Section 7 obligations. The expert wildlife agencies are generally the repositories of the best scientific evidence given their role in listing threatened and endangered species, in conducting Section 7 consultations, in issuing incidental take permits and statements, and in developing recovery plans. Their participation in Section 7 consultations injects their unique, comprehensive scientific knowledge into Section 7 determinations. The ESA mandates such consultations to ensure that an agency action "is not likely to jeopardize the continued existence of any" listed species. 16 U.S.C. §1536(a)(2). The joint consultation regulations require such consultations whenever an action "may affect" a listed species. See 50 C.F.R. §402.14.

The end product of formal consultation is a biological opinion in which the FWS determines whether the action will jeopardize the survival and recovery of listed species or will adversely modify the species' critical habitat. 16 U.S.C. §1536(b). In order to make this determination, the FWS must review all relevant information and provide a detailed evaluation of the action's effects, including the cumulative effects of federal and nonfederal activities in the area, on the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)-(h). The FWS has a statutory duty to use the best available scientific data in an ESA consultation. 16 U.S.C. §1536(a)(2); 50 C.F.R. §402.14(g)(8). If the FWS determines the action is likely to jeopardize the species, the biological opinion must specify reasonable and prudent alternatives that will avoid jeopardy. 16 U.S.C. § 1536(b); 50 C.F.R. §402.14(h)(3). The FWS may also formulate discretionary conservation

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
Laura Yoshii, Acting Regional Administrator
U.S. Environmental Protection Agency, Region 9
November 16, 2009
Page 3

recommendations to reduce or minimize the action's impacts on listed species or critical
habitat. 50 C.F.R. §402.14(g)(6).

Action agencies, like the EPA, must review the programs that they administer and
consult with the expert fish and wildlife agencies to ensure they utilize their programs and
authorities to conserve listed species. The ESA requires all Federal agencies to ensure
that authorized actions should not jeopardize the existence of listed endangered and
threatened species. Since the EPA under the FIFRA registers pesticides, which may
impact listed endangered and threatened species, compliance with the ESA is required.

## II.    THE EPA'S DUTY UNDER FIFRA

The FIFRA charges the EPA with registering, reviewing, amending, and
reregistering chemicals and chemical formulations for use as insecticides, fungicides, and
pesticides in the United States. 7 U.S.C. §§136-136y. Under FIFRA, a pesticide generally
may not be sold or used in the United States unless it has an EPA registration for that
particular use. 7 U.S.C. §136a(a). EPA may register a pesticide if it makes the following
determinations: (1) the labeling complies with FIFRA's requirements; (2) the
composition claims are warranted; (3) the pesticide will perform its intended function;
and (4) the pesticide will not cause unreasonable adverse effects on the environment. 7
U.S.C. § 136a(c)(5). The culmination of the registration process is EPA's approval of a
label for the particular pesticide. The FIFRA makes it unlawful to use a pesticide in a
manner inconsistent with the label. Id. at §136j(2)(G), or to make any claims that differ
substantially from the label. Id. at §136j(1)(B).

After approving a pesticide registration, EPA retains discretionary involvement
and control over that registration. EPA must periodically review pesticide registrations
with a goal of reviewing each pesticide registration every 15 years. Id. at § 136a(g)(1).
EPA has the authority to compel registrants to submit data necessary for a reregistration
review. Id. at §136a(g)(2). Even apart from such explicit data submission requirements,
registrants must submit to EPA any information about registered pesticides' unreasonable
adverse effects on the environment. Id. at § 136d(a)(2). EPA takes such information into
account in reviewing and, where necessary, modifying the pesticide registrations.

In October of 1988, the FIFRA Amendments of 1988 were signed into law with
most of the provisions becoming effective on December 24, 1988. These amendments
accelerated the reregistration process for previously registered pesticides. EPA is in the
process of reregistering pesticides that have been on the market for years and often
decades prior to enactment of the environmental registration requirements currently in
place. 7 U.S.C. §136a-1. EPA generally eliminates or imposes restrictions on harmful

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
Laura Yoshii, Acting Regional Administrator
U.S. Environmental Protection Agency, Region 9
November 16, 2009
Page 4

uses of the pesticides, including those uses that cause harm to threatened or endangered species, as part of the reregistration determination.

The EPA Administrator has the authority to cancel pesticide registrations whenever "a pesticide or its labeling or other material required to be submitted does not comply with the provisions of this Act or, when used in accordance with widespread and commonly recognized practice, generally causes unreasonable adverse effects on the environment." 7 U.S.C. §136d(b). The Administrator may immediately suspend a pesticide registration to prevent an imminent hazard. 7 U.S.C. §136d(c). An announcement by the Administrator of an intent to cancel a pesticide use often results in the registrant's voluntary cancellation of, or agreement to further constraints upon that use.

## III.    ROTENONE

Rotenone is an aquatic pesticide that interferes with oxygen use and is especially toxic to organisms that obtain oxygen from water, such as fish, amphibians and aquatic invertebrates. Certain species of aquatic invertebrates are particularly susceptible to long-term or permanent extirpation from streams poisoned by rotenone. Rotenone also has indirect lethal and sublethal effects because amphibians, birds and other species will likely suffer from depleted food sources as rotenone will decrease insect populations and macro-invertebrates and will eliminate fish populations. Rotenone has recently been linked with Parkinson's disease in humans. Three ingredients in the proposed rotenone formulations are on the Proposition 65 list of chemicals known to the state of California to cause cancer or reproductive toxicity.

The EPA classifies rotenone as highly toxic or slightly toxic depending on concentration. The World Health Organization classifies it as moderately hazardous.[1] Rotenone is classified by the United States Department of Agriculture National Organic Program as a nonsynthetic and was allowed to be used to grow "organic" produce until 2005 when it was removed from the list of approved substances due to concerns about its safety.[2] Dermatitis, allergies and possible Parkinson's like symptoms[3] are potential problems in mammals.

---

[1] IPCS, International Programme on Chemical Safety; United Nations Environment Programme; International Labour Organization; World Health Organization. (2007). The WHO Recommended Classification of Pesticides by Hazard. World Health Organization. http://www.who.int/ipcs/publications/pesticides_hazard/en/.

[2] Rotenone. Resource Guide for Organic and Disease Management. Cornell University.

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
Laura Yoshii, Acting Regional Administrator
U.S. Environmental Protection Agency, Region 9
November 16, 2009
Page 5

Clearly, although a plant extract and not a synthetic compound, rotenone is not categorically safe for humans, other mammals, or birds; nor is it safe for insects or fish.

## IV.    EPA'S REREGISTRATION OF ROTENONE

According to the EPA's Reregistration Eligibility Decision for Rotenone ("Reregistration Decision"), it was first registered in the United States in 1947. It was determined to be eligible for reregistration on March 31, 2007.

In its Reregistration Decision, the EPA acknowledges the ESA is applicable to its registration process, however, it then references an "ecological assessment" that EPA conducted. There is no evidence the EPA consulted with the FWS to ensure that listed species under the ESA were not affected by its authorization of the use of rotenone. Indeed, the Reregistration Decision at page 26 specifically states "If the [EPA]'s specific assessments for rotenone result in the need to modify the use of the pesticide, any geographically specific changes to the pesticide's registration will be implemented through the process described in the [EPA]'s Federal Register Notice (54 FR 27984) regarding the implementation of the Endangered Species Protection Program."

This acknowledgement is insufficient to meet the stringent requirements of Section 7 of the ESA. It is clear that rotenone, a product specifically designed to kill fish by altering their ability to breathe, "may affect" endangered or threatened species by its very nature. In fact, the EPA has authorized use of rotenone in projects to "renovate" lakes and waterways to "protect endangered species," but these projects have failed to enhance populations of the intended species. Rotenone projects consist of a plan to eradicate non-native fish by applying the rotenone to the lake or waterway and then re-introducing native fish back to the system. These projects have failed repeatedly throughout the West, while causing significant damage to the beneficial uses of streams by native macro-invertebrates, amphibians, and non-target native fish.

Planned "renovation" projects using rotenone in Arizona creeks and lakes pose great risks to many of Arizona's 37 listed endangered and threatened species, including the desert pupfish (*Cyprinodon macularius*), Chiricahua leopard frogs (*Rana chiricahuensis*), spikedace (*Meda fulgida*), loach minnow (*Tiaroga cobitis*), bonytail chub (*Gila elegans*), and razorback sucker (*Xyrauchen texanus*).

---

[3] Caboni P, Sherer T, Zhang N, Taylor G, Na H, Greenamyre J, Casida J (2004). "Rotenone, deguelin, their metabolites, and the rat model of Parkinson's disease". Chem Res Toxicol 17 (11): 1540–8. doi:10.1021/tx049867r. PMID 15540952.

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
Laura Yoshii, Acting Regional Administrator
U.S. Environmental Protection Agency, Region 9
November 16, 2009
Page 6

According to its own Reregistration Decision, if there is "a determination that there is a likelihood of potential effects to a listed species," such determination may result in "consultations with the [FWS] or [NMFS], as necessary." Given the potential harmful effects of the application of rotenone to the lakes and waterways of Arizona on the native macro-invertebrates, amphibians, and non-target native fish, including listed endangered and threatened species as described above, *the EPA must suspend its registration, reregistration and continued authorization of the use of rotenone until the completion of a Section 7 consultation with the FWS.*

## V.   CONCLUSION

If the EPA does not act within 60 days to correct its ongoing violation of Section 7 of the ESA, Dr. Yard will pursue litigation in federal court against the agency and the officials addressed in this letter. We will seek declaratory and injunctive relief and legal fees and costs regarding these violations. If you have any questions or wish to meet with us to discuss this matter or feel this notice is in error, please contact me at 480-969-0500 or my cell phone at 602-291-5800.

Sincerely,

T. Gerald Chilton, Jr.

TGCJr/mm